### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

KANSAS CITY SOUTHERN                        CIVIL ACTION NO. 06-0003
RAILWAY COMPANY

VERSUS                                      JUDGE S. MAURICE HICKS, JR.

PILGRIM'S PRIDE CORPORATION                 MAGISTRATE JUDGE HORNSBY
f/k/a CON AGRA POULTRY COMPANY
d/b/a CON AGRA BROILER COMPANY

### MEMORANDUM RULING

Before the Court are cross Motions for Summary Judgment relating to plaintiff Kansas City Southern Railway Company's ("KCS") claims for affirmative relief.  The first Motion for Summary Judgment (Record Document 87) was filed by KCS seeking summary judgment as to its contractual claim for indemnity.  The second Motion for Summary Judgment (Record Document 88) was filed by defendant Pilgrim's Pride Corporation ("Pilgrim's") seeking summary judgment on all of KCS's claims for affirmative relief.  For the reasons which follow, KCS's motion is **GRANTED** and Pilgrim's motion is **DENIED**.

### BACKGROUND

In 1989, Con Agra Poultry Company ("Con Agra"), entered into two contracts with KCS related to property located in Many, Louisiana.  The property was 4.6 acres in size and laid to the west of a KCS north-south main line.  The easternmost portion of the property was intersected by McDonald Drive.  Con Agra operated a feed mill in the northwestern quadrant of the property, which was created by the intersection of McDonald Drive and the KCS main line.

While specific facts surrounding the actual drafting and execution of the 1989 contracts are unclear, KCS has submitted the contracts as summary judgment evidence.

Based on the face of the contracts, the Lease Agreement for Industrial Site ("Lease Agreement") was executed on June 15, 1989 and signed by the presidents of both KCS and Con Agra and the Industry Track Agreement ("Track Agreement") was executed on September 1, 1989 and was signed by the presidents of both KCS and Con Agra.  See Record Document 87, Exhibits 31 and 32.

KCS also presented the deposition testimony of David W. Brookings ("Brookings"),[1] who was employed by KCS from 1972 to 1999, in regards to the Agreements.  See id., Exhibit C at 11.  In 1989, Brookings served as vice president and chief engineer for KCS. See id., Exhibit C at 12.  He testified that Con Agra approached KCS and inquired whether the feed mill could be expanded and whether the sidetracks servicing the feed mill could be arranged such that the facility could receive longer trains and a more favorable transportation rate.  See id., Exhibit C at 19-20.  According to Brookings, negotiations followed and the end result was manifested in the Lease Agreement and the Track Agreement.  See id., Exhibit C at 20.  Brookings testified that the purpose of the Lease Agreement was to lease Con Agra land to rearrange its trackage for the expansion of the feed mill and the purpose of Track Agreement was to reconstruct the sidetracks.  See id., Exhibit C at 19-20, 28.

After the execution of the Agreements, the sidetracks were reconstructed so that a spur track came off of the KCS main line north of the feed mill, split into two tracks just short of the feed mill, and then proceeded south as two tracks along and beyond the feed mill.  See id., Exhibit A at 47-50; Exhibit K at 20-21.  After the feed mill, the two tracks

---

[1]Brookings was designated as KCS's corporate representative during depositions.

intersect McDonald Drive and subsequently reconnect with the KCS main line.  <u>See id.</u>,

Exhibit A at 47-50.

In 2003, Pilgrim's acquired Con Agra, including its contractual obligations and the

feed mill, via a stock purchase agreement.  <u>See id.</u>, Exhibit 95, Exhibit 238 at ¶ 6, & Exhibit

B at 6-7.  Less than one year later, Con Agra merged into Pilgrim's.  <u>See id.</u>, Exhibit D and

Exhibit 239 at 38-39, 55.

On January 5, 2004, a KCS train heading southbound on the main line collided with

a UPS truck driving eastbound on McDonald Drive.  <u>See id.</u>, Exhibit K.  The UPS truck was

driven by Levi Davis, Jr.  <u>See id.</u>  Mr. Davis was severely injured.  <u>See id.</u>  On June 2,

2004, Mr. Davis and his wife sued KCS in the Western District of Louisiana for negligence

and for maintaining a defective railroad crossing ("the Davis suit").  <u>See id.</u>, Exhibit F.  KCS

asserted defenses of contributory and/or comparative negligence and federal preemption.

<u>See id.</u>, Exhibit H.

KCS prepared for the bench trial of the Davis suit, but grew increasingly concerned

about its risk of exposure.  <u>See id.</u>, Exhibits 78, 231.  Counsel for KCS classified the case

as one of probable liability, specifically noting conflicting testimony as to whether rail cars

were parked on the sidetracks so as to impede the view of the main line and the lack of

signage at the crossing referencing "multiple tracks" or "three tracks."  <u>See id.</u>, Exhibits

229, 231. The parties in the Davis suit engaged in settlement negotiations and formal

mediations prior to the August 2005 trial date. <u>See id.</u>, Exhibits 80, 83, 225.

According to KCS, on or about August 17, 2005, just days before the trial was set

to begin in the Davis suit, a KCS representative discovered the Lease and Track

Agreements.  <u>See id.</u>, Exhibits 88, 223.  KCS alleges that this was the first time it realized

it had a potential indemnity claim against Pilgrim's for losses associated with the Davis suit.

See id., Exhibit 223.  KCS believed that it was entitled to indemnity pursuant to Section 22

of the Lease Agreement, which provides:

> The Lessee [Pilgrim's] agrees to defend, indemnify and hold harmless the Lessor [KCS] from and against any and all claims, demands, actions, liability, responsibility and causes of action asserted against them for death, injury, loss or damage resulting to the Lessor's employees or property, or to the Lessee or the Lessee's employees or property (including the Lessee's building located on said premises), or to any other persons or their property, and for all penalties, fines, costs, response, removal, remedial and clean up costs, corrective action, natural resource damage and damages and expenses of any other nature whatsoever, including legal fees and court costs, arising from, related to or happening in connection with the use or occupancy of the leased premises by the Lessee and its agents, servants, employees, contractors and representatives.
>
> The Lessee further agrees that its obligation of indemnity hereunder shall be strict and absolute, and shall remain in full force and effect irrespective of any negligence on the part of the Lessor.

Id., Exhibit 31 at 5.  Alternatively, KCS believed it had a valid claim for indemnity pursuant

to Section 9(c) of the Track Agreement, which provides:

> Industry [Pilgrim's] agrees as follows:
>
> To defend, indemnify and hold harmless Railway Company [KCS] from and against any and all claims, demands, actions, liability, responsibility and causes of action asserted against them for death, injury, loss or damage resulting to Railway Company's employees or property, or to Industry or Industry's employees or property, or to any other persons or their property, and for all penalties, fines, costs, response, removal, remedial and clean up costs, corrective action, natural resource damage and damages and expenses of any other nature whatsoever, including legal fees and court costs arising from, related to or happening in connection with the use of said sidetrack by Industry and its agents, servants, employees, contractors and representatives.
>
> Industry further agrees that its obligations of indemnity hereunder shall be strict and absolute, and shall remain in full force and effect irrespective of any negligence on the part of Railway Company.

Id., Exhibit 32 at 4.

Pilgrim's maintains that August 17th was not the first time that KCS recognized it had a potential indemnity claim under the agreements.  Instead, Pilgrim's argues that KCS admitted that it had copies of the agreements in its files since 1989, and was able to find the agreements on less than one day's notice in May 2004.  See Record Document 94, Exhibits 15-17.

On August 19, 2005, KCS demanded indemnification from Pilgrim's.  See Record Document 87, Exhibits 223, and Z.  Specifically, KCS' attorneys sent a letter to Pilgrim's (1) notifying it of the Davis suit and the trial setting of August 22, 2005; (2) asserting that the claims set forth in the Davis suit fell within the agreements' indemnity provisions; and (3) inviting comments.  See id., Exhibits U, 8, and Z.  KCS also notified the presiding judge and the Davises of its discovery of the agreements.  See id., Exhibits 88, K, and 223.

Pilgrim's contends that it has no record of receiving the August 19th letter and had no copy of the August 19th letter in its files prior to the filing of this suit.  See Record Document 94, Exhibit 18.  It further notes that the fax was sent to an unassigned fax number.  See id., Exhibits 16, 17, 19, and 20.  Thus, Pilgrim's disputes that it received the August 19th letter prior to KCS filing the instant lawsuit.

The bench trial of the Davis suit commenced on August 22, 2005.  The Davises presented live witness testimony and their theories of liability at trial included:  (1) the placement of railcars on the sidetracks; (2) KCS's failure to maintain McDonald Drive on and around the crossing; (3) the absence of proper signage; (4) KCS's alleged failure to sound an audible whistle; (5) the train's excessive speed, and (6) the "dangerous trap" created by the sidetracks.  See Record Document 87, Exhibit 86.  Specifically, the Davises

Page 5 of  22

offered testimony from several witnesses, both lay and expert, indicating that there were

Pilgrim's railcars on the property that could have distracted Mr. Davis, obscured his vision,

or created an illusion of safety based on the configuration of the sidetracks in relation to

the KCS main line.   See id., Exhibits 233, 220, 218, 219, 217, 228.   At trial, KCS

proceeded on the theory that the Davises' injuries resulted from Mr. Davis' negligence in

proceeding through the crossing in the path of an oncoming train.  See id., Exhibit I.  KCS'

attorneys cross-examined each of the Davises' witnesses in an attempt to minimize

damages and bolster its defenses.  See id., Exhibit K.[2]

Following the presentation of the Davises' case, KCS and the Davises reached a

settlement in principle[3] that was read into the record on August 23, 2005.  See id., Exhibits

N, 223, and Z.  On that same date, KCS alleges that it again notified Pilgrim's of the Davis

suit and the indemnity claim by resending the August 19th letter.   See id., Exhibit U.

Pilgrim's has no record of receiving such letter prior to KCS's filing of the instant lawsuit.

See Record Document 94-2 at ¶ 36.  On August 24, 2005, the court entered a Ninety Day

Order of Dismissal.[4]  See Record Document 87, Exhibit O.

On October 12, 2005, the Davises and KCS consummated their settlement by

completing a written General Release and Settlement Agreement.  See id., Exhibits 5, 223,

_____

[2]Pilgrim's contends that KCS deliberately set out to prove at trial that the accident was the fault of Pilgrim's.

[3]KCS agreed to pay approximately $2.25 million to the Davises via a structured settlement.

[4]The Ninety Day Order of Dismissal stated "that this action is hereby DISMISSED, without prejudice to the right, upon good cause shown within ninety (90) days of the signing of this Order, to reopen the action if settlement is not consummated."   See Record Document 87, Exhibit O.

and Z.   On November 17, 2005, KCS sent another letter to Pilgrim's demanding indemnification.   See id., Exhibits P and 69.   The November 17th letter noted the transmittal of the August 19th letter, reiterated its contents, indicated that a final settlement in the amount of $2,258,884.40 had been consummated, stated that KCS had incurred legal fees in the amount of $264,307.07, and demanded immediate payment in the amount of $2,523,191.47 under the Lease Agreement, or in the alternative, the Track Agreement. See id., Exhibit 69.  The November 17th letter further advised Pilgrim's that KCS would sue it for indemnification, reasonable fees, interest, and court costs if Pilgrim's failed to respond within 15 days from the date of the letter.   See id.   KCS received no response from Pilgrim's and filed the instant lawsuit on January 3, 2006.  See id., Exhibit 9. Pilgrim's has no record of ever receiving the November 17th letter.  See Record Document 94, Exhibit 18.[5]

## LAW AND ANALYSIS

**I.      Summary Judgment Standard.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

_____

[5]KCS argues that Pilgrim's received the letter, as evidenced by a completed "Green Card."  See Record Document 87, Exhibits P, 70, and Q.

essential to that party's case, and on which that party will bear the burden of proof at trial."

Id., 477 U.S. at 322, 106 S. Ct. at 2552.  If the party moving for summary judgment fails

to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact,

the motion must be denied, regardless of the nonmovant's response.  See Little v. Liquid

Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the motion is properly made,

however, Rule 56(c) requires the nonmovant to go "beyond the pleadings and designate

specific facts in the record showing that there is a genuine issue for trial."  Wallace v.

Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).   The

nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated

assertions, metaphysical doubt as to the facts, or a scintilla of evidence.  See Little, 37

F.3d at 1075;  Wallace, 80 F.3d at 1047.  All factual controversies must be resolved in

favor of the nonmovant.  See Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 456 (5th

Cir. 2005).

## II.     Motion for Summary Judgment filed by Pilgrim's (Record Document 88).

Pilgrim's has moved for summary judgment as to KCS' contractual indemnification

claim on three grounds: (1) KCS has no evidence that the Lease and Track Agreements

were in effect on the date of the Davis accident; (2) the Davis accident and suit did not fall

within the Agreements' indemnity provisions; and (3) KCS failed to provide adequate notice

of the Davis suit to Pilgrim's, thus requiring KCS to prove that it would have been actually

liable to the Davis plaintiffs.  See Record Document 88.  The Court will consider each of

these arguments in turn.

The motion is denied as to the first ground, as KCS has presented the Agreements

themselves as competent summary judgment evidence.  See Waltzer v. U-Haul Co. of

<u>South La., Inc.</u>, 503 So.2d 574, 575 -576 (La.App. 4 Cir. 1987) ("A contract is the proof the parties have established in advance to govern their relationship in the event of suit.  The contract is the law between the parties. . . .  Thus a plaintiff who knows of a writing which is the principal basis for his claims must produce it when it is the best evidence of the facts at issue. . . .  [W]hen the contract is reduced to writing, the writing is the required proof."). Moreover, in the deposition of its corporate representative, Pilgrim's admitted that it had no knowledge that the Agreements had terminated and did not know whether the Agreements were in effect at the time of the Davis accident.  <u>See</u> Record Document 96, Exhibit 242 at 42-43, 55.  At most, Pilgrim's has only metaphysical doubts to question the validity of the Agreements.  Pilgrim's also failed to allege in its answer that the Agreements were invalid.  <u>See</u> Record Document 39.  In fact, Pilgrim's stated in its Answer that the Agreements "speak for themselves."  <u>Id.</u> at ¶¶ 13-15.  Summary judgment is, therefore, denied.

Next, Pilgrim's argues that the Davis accident and suit did not fall within the Agreements' indemnity provisions because (1) the indemnification provisions apply only where both Pilgrim's and KCS were sued; (2) KCS is judicially estopped from claiming that Pilgrim's had anything to do with the Davis accident; and (3) the accident was wholly unrelated to Pilgrim's use or occupancy of the leased premises or sidetracks.  Pilgrim's maintains that the Agreements clearly and unambiguously require indemnification only for those incidents where both Pilgrim's and KCS are sued;[6] thus, since the Davis plaintiffs

---

[6]Pilgrim's relies on Section 22's and Section 9(c)'s use of the plural pronoun "them" instead of the singular pronoun "it."  <u>See</u> Record Document 88-7 at 8-11.  The Lease Agreement reads, in relevant part:  "[Pilgrim's] agrees to defend, indemnify and hold harmless [KCS] from and against any and all claims, demands, actions, liability,

sued only KCS, indemnification is not required.  Irrespective of the merits of this argument, summary judgment must be denied because Pilgrim's failed to disclose this litigation theory in response to a contention interrogatory and/or in its answer.  See Record Document 109 at 3-4; Wechsler v. Hunt Health Systems, Ltd., No. 94-8294, 1999 WL 397751, *11 (S.D.N.Y. June 16, 1999) ("[F]ailure to disclose a litigation theory in response to contention interrogatories has preclusive effect.").  Neither Pilgrim's response to the contention interrogatory nor its answer provided fair notice of the "them" argument to KCS.  See Shelak v. White Motor Co., 581 F.2d 1155, 1159 (5th Cir. 1978) ("The [federal] rules are designed to narrow and clarify the issues and to give the parties mutual knowledge of all relevant facts, thereby preventing surprise.").  Thus, summary judgment on this ground is also denied.

Pilgrim's seeks summary judgment due to KCS's judicial admissions in the underlying suit and on the ground that KCS is judicially estopped from claiming that Pilgrim's had anything to do with the Davis accident.  Pilgrim's contends that because KCS argued in the underlying suit that Mr. Davis' own negligence was the sole cause of the accident, it cannot now argue that the Davis accident arose from, related to, or happened in connection with Pilgrim's use or occupancy of the leased premises or use of the sidetracks.  Pilgrim's judicial admission argument fails, as "judicial admissions are not

---

responsibility and causes of action asserted against **them** for death, injury, loss or damage resulting to . . . other persons[.]" Record Document 88, Exhibit 1 at § 22 (emphasis added). The Track Agreement reads similarly:  "In consideration of the covenants of [KCS] herein contained, [Pilgrim's] agrees as follows:  . . . (c) To defend, indemnify and hold harmless [KCS] from and against any and all claims, demands, actions, liability, responsibility and causes of action asserted against **them** for death, injury, loss or damage resulting to . . . other persons[.]" Id., Exhibit 2 at § 9(c) (emphasis added).

conclusive and binding in a separate case from the one in which the admissions were made."  Univ. Am. Barge Corp. v. J-Chem, Inc., 946 F.2d 1131, 1142 (5th Cir. 1991). Pilgrim's judicial estoppel argument likewise fails because the judge presiding in the underlying suit did not accept or rely on KCS's position because the Davis suit settled.[7] Accordingly, summary judgment on the grounds of judicial admissions or judicial estoppel is denied.

Pilgrim's next basis for summary judgment relates to its argument that the Davis accident was wholly unrelated to its use or occupancy of the leased premises or sidetracks. The indemnity provisions contain the following causation language:  "***arising from, related to or happening in connection with*** the use or occupancy of the leased premises by [Pilgrim's] and its agents, servants, employees, contractors and representatives" and "***arising from, related to or happening in connection with*** the use of said sidetrack by [Pilgrim's] and its agents, servants, employees, contractors and representatives."  Record Document 87, Exhibits 31 and 32 (emphasis added).  Under Louisiana law, the language contained in indemnity agreements is generally strictly construed.  See Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1215 n. 6 (5th Cir. 1986); see also Poole v. Ocean Drilling & Exploration Co., 439 So.2d 510, 512 (La.App. 1 Cir. 1983).  In cases interpreting contractual indemnity provisions employing "arising out of" language, Louisiana courts have

---

[7]"Courts employ several factors in determining whether to apply the [judicial estoppel] doctrine:  (1) whether the party's later position is clearly inconsistent with its earlier position; (2) ***whether the party has succeeded in persuading a court to accept that party's earlier position***; (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  In re Ark-La-Tex Timber Co., Inc., 482 F.3d 319, 332 (5th Cir. 2007) (emphasis added).

applied a but for causation test.  See Perkins v. Rubicon, Inc., 563 So.2d 258, 259 -260 (La. 1990); Dean v. Griffin Crane & Steel, Inc., 2005-1226 (La.App. 1 Cir. May 5, 2006), 935 So.2d 186.  However, Louisiana courts have given "a broader construction to such phrases as 'in connection with.'"  Fontenot, 791 F.2d at 1215 n. 6; see also Poole, 439 So.2d at 512 (indemnity phrase "in connection with" means "being related to or associated with, but not the primary or only purpose of").

In the underlying suit, the Davises alleged, among other things, that the failure to maintain the surface of McDonald Drive over the sidetracks; the location of railcars on the sidetracks; the absence of proper signage indicating the sidetracks; and the dangerous trap created by these circumstances caused their injuries.  See Record Document 78, Exhibit 86.  Due to the broad language, i.e., "arising from, related to or happening in connection with," used in the indemnity provisions at issue in this case, the Court finds as a matter of law that each of the aforementioned liability theories fall within the scope of the indemnity provisions.  These liability theories were connected to, related to, and/or in some way associated with Pilgrim's use and occupancy of the leased property and sidetracks. Pilgrim's corporate representative conceded that such theories could not have been asserted by the Davises absent Pilgrim's use of the sidetracks and occupancy of the leased property.  See Record Document 87, Exhibit 239 at 95-96, 96-99, 101-102, 107-108.  Thus, Pilgrim's motion for summary judgment on the grounds that the Davis accident was wholly unrelated to its use or occupancy of the leased premises or sidetracks is denied.

Finally, Pilgrim's moves for summary judgment on the ground that KCS failed to provide adequate notice of the Davis lawsuit to Pilgrim's and was unsuccessful in proving

that KCS would have been actually liable to the Davis plaintiffs.  First, as to the notice issue, a review of the plain language of the Lease and Track Agreements, namely the indemnity provisions, reveals no notice requirement.  Further, while the party seeking indemnity generally must establish actual liability to recover, "[a]n exception to the rule is that the indemnitee need show only potential, rather than actual, liability on his part where the claim is based on a written contract."  Vaughn v. Franklin, 2000-0291 (La.App. 1 Cir. 3/28/01),  785 So.2d 79, 87; see also Sullivan v. Franicevich, 2004-0321 (La.App. 4 Cir. Mar. 9, 2005), 899 So.2d 602, 609 ("As a general rule, one seeking indemnity for a settlement must show actual liability to recover; however, where the claim is based upon a written contract, such as an insurance policy, the indemnitee need show only potential, rather than actual, liability on his part.").  Because its indemnity claims are based on the written indemnity provisions set forth in the Lease and Track Agreements, KCS need only show potential, not actual, liability in this case.[8]  Thus, Pilgrim's motion seeking summary

---

[8]In its motion, Pilgrim's argued the following:

Under Louisiana law, to obtain indemnification for a settlement, a settling indemnitee must prove both actual liability to the original plaintiff and that the amount paid to original plaintiff was reasonable.  See, e.g., Walter v. A-Way Tank Service, Inc., 802 So. 2d 1, 5 (La. App. 2000); Morris v. Schlumberger, Ltd., 445 So. 2d 1242, 1246 (La. App. 1984).  This rule basically requires an indemnitee to prove the original plaintiff's case against itself. Id.; see also Transcon. Pipe Line Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, No. CIV.A. 01-448A, 2005 WL 1750557, at *7 (M.D. La. May 20, 2005).  In order to avoid this dilemma, Louisiana law allows an indemnitee to enforce its indemnification rights by proving potential liability if certain notice requirements are met. Louisiana law allows an indemnitee to avoid the burden of proving actual liability if it gives the indemnitor (i) notice of and opportunity to take over the defense of the underlying case or (ii) the opportunity to approve the underlying settlement. Transcon. Pipe Line, 2005 WL 1750557, at *7; Morris, 445 So. 2d at 1246.  The primary concern is fairness to the indemnitor. Id.; see also James v. Hyatt Corp. of Del., 981

judgment on the grounds of inadequate notice and KCS's failure to prove actual liability is denied.

## III.   Motion for Summary Judgment filed by KCS (Record Document 87).

KCS argues that summary judgment on its contractual indemnity claim is appropriate because the Agreements are valid conventional obligations and clearly and explicitly obligate Pilgrim's to indemnify KCS for potential liability associated with the Davis accident.  KCS relies primarily on Section 22 of the Lease Agreement, and, alternatively, on Section 9(c) of the Track Agreement.

An indemnification agreement is a conventional obligation under Louisiana law. Article 1994 of the Louisiana Civil Code provides:

> An obligor is liable for the damages caused by his failure to perform a conventional obligation.  A failure to perform results from nonperformance . . . .

La. C.C. Art. 1994.  To prevail on a breach of conventional obligation claim, a complainant must show (1) the existence of a contract; (2) a breach occurred by failure to perform, nonperformance, or deficient performance; and (3) that the breach caused damages.  See Stanton v. Tulane Univ. of La., 2000-0403 (La.App. 4 Cir. Jan. 11, 2001), 777 So. 2d 1242, 1249; Haerting v. One Toucan Du, Inc., No. 94-0142, 1995 U.S. Dist. LEXIS 5564, at *3

---

F.2d 810, 815 (5th Cir. 1993).

Record Document 88-7 at 19.  The cases cited by Pilgrim's are not controlling and are unpersuasive.  The Morris court applied equitable principles of indemnity pursuant to federal maritime indemnity law, not Louisiana indemnity law.  See Morris, 445 So.2d at 1246. Likewise, the Transcon. Pipe Line relied heavily upon Parfait v. Jahncke Serv., Inc., 484 F.2d 296 (5th Cir. 1973), wherein the court drew a clear distinction between contractual indemnity and indemnity by operation of law.

(E.D.La. Apr. 25, 1995); <u>Volvo Trucks N. Am., Inc. v. Crescent Ford Truck Sales, Inc.</u>, No. 02-3398, 2004 U.S. Dist. LEXIS 4824, at *5 (E.D.La. Mar. 23, 2004).

As stated above, KCS has presented the Lease and Track Agreements as summary judgment evidence in this case.  The Court finds that, as a matter of law, the Agreements are valid.  As discussed previously, Pilgrim's metaphysical doubts as to the validity of the Agreements, coupled with its failure to allege in its answer that the Agreements were invalid, is simply insufficient to defeat summary judgment.

Both Agreements contain indemnity provisions, which are valid and enforceable under Louisiana law.  <u>See</u> <u>Fid. & Deposit Co. v. F.D. Shay Contractor, Inc.</u>, No. 05-197, 2006 U.S. Dist. LEXIS 3047, at *12 (W.D. La. Jan. 18, 2006).  In order to determine whether the indemnity provisions were breached by nonperformance, the Court must decide whether Section 22 of the Lease Agreement and/or Section 9(c) of the Track Agreement required Pilgrim's to indemnify KCS for the Davis accident/suit.[9]  The determination of whether a contract has been breached begins with an analysis of the terms of the agreement.  <u>See</u> <u>Hai Nam Chinese Rest. P'ship v. B & B Const. of New Iberia</u>, 2006-729 (La.App. 3 Cir. Nov. 2, 2006), 942 So.2d 97, 102.  Specifically, the language of an indemnity agreement "dictates the obligations of the parties."  <u>Id.</u> at 105.

KCS argues that Section 22 of the Lease Agreement clearly obligates Pilgrim's to indemnify KCS for the losses associated with its potential liability for its alleged failure to maintain McDonald Drive on and around the sidetracks, alleged negligent placement of

---

[9]Pilgrim's once again argues that the Agreements' indemnification provisions apply only where both Pilgrim's and KCS are sued.  For the reasons previously set forth in Section II at 9-10 of this Memorandum Ruling, the Court is unpersuaded by this argument.

railcars on the sidetracks, alleged absence of proper signage, and the alleged "dangerous trap."  As discussed in Section II at pages 11-12 of the instant Memorandum Ruling, the "arising from, related to or happening in connection with" language in Section 22 enjoys a broad construction.  Thus, the Court finds as a matter of law that the aforementioned acts and omissions fall within the scope of Section 22 of the Lease Agreement.  No railcars would have been on the sidetracks on the day of the Davis accident had Pilgrim's not been using the property for the feed mill.  Further, there would not have been sidetracks requiring additional signage but for Pilgrim's use of the property for its feed mill operation. The summary judgment record also establishes that the purpose of the  Lease Agreement was to enable Pilgrim's to construct and use sidetracks on the leased premises for the feed mill's benefit.  See Record Document 88, Exhibit C at 12-13; 19-20, 27-29; Exhibit A at 73-77; 77:14-17; Exhibits 9, 36, 47, 48, 52.  The Lease Agreement itself reads:

> PURPOSE.–3.  The said premises shall be used as a site for a feed mill operation . . . The Lessee is hereby granted a license to build, own and maintain railroad trackage on said premises.

Id., Exhibit 31.  Finally, without the use of the property for the placement of sidetracks, there would have been no duty to maintain McDonald Drive on and around the sidetracks nor severe damage to the roadway over the sidetracks.  See id., Exhibit 239 at 101-102. The acts and omissions alleged by the Davis plaintiffs are intrinsically tied to the existence of the sidetracks constructed by Pilgrim's as part of its use of the leased premises; thus, the alleged acts and omissions arose from, related to, or happened in connection with Pilgrim's use or occupancy of the leased premises.

Likewise, the Court finds as a matter of law that Section 9(c) of the Track Agreement requires Pilgrim's to indemnify KCS for losses associated with its potential liability for the

acts and omissions alleged by the Davis plaintiffs.  The alleged negligent parking of railcars on the sidetracks, which purportedly contributed to a dangerous trap, and the alleged negligent maintenance of McDonald Drive across and around the sidetracks relates to Pilgrim's "use" of the sidetracks. See id., Exhibit 239 at 95-99, 101-102, 107-108.  Further, but for Pilgrim's use of the sidetracks, the Davis plaintiffs could not have claimed that there should have been signage indicating that the sidetracks were in use.  See id. at 99-100.  Thus, the summary judgment record establishes that the alleged acts and omissions arose from, related to or happened in connection with the use of the sidetracks.

In addition to proving that the purported negligent acts and omissions alleged by the Davis plaintiffs fell within the scope of the Agreements' indemnity provisions, KCS must also prove that it was potentially liable to the Davises.  In Fontenot v. Mesa Petroleum Co., 791 F.2d 1207 (5th Cir. 1986), the Fifth Circuit reasoned:

> [T]he existence of a valid indemnity agreement should ease the indemnitee's burden.  A court confronted with such an agreement should insure that the claim was not frivolous, that the settlement was reasonable, that it was untainted by fraud or collusion, and that the indemnitee settled under a reasonable apprehension of liability.

Id. at 1218.  Other courts have expanded on this rationale, stating:

> Potential liability actually means nothing more than that the indemnitee acted reasonably in settling the underlying suit.  The reasonableness of the settlement consists of two components, which are interrelated.  The fact finder must look at the amount paid in settlement of the claim in light of the risk of exposure.  The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed. If the amount of the settlement is reasonable in light of the fact finder's analysis of these factors, the indemnitee will have cleared this hurdle.

Musgrave v. Enter. Leasing Co., No. 246962, 2004 Mich. App. LEXIS 2443, at *6-7 (Mich. Ct.App. Sept. 21, 2004), quoting Ford v. Clark Equip. Co., 87 Mich. App. 270, 277-78, 274

N.W.2d 33 (1978); <u>Whittle v. Timesavers, Inc.</u>, 572 F. Supp. 584, 588 (W.D. Va. 1983), rev'd on other grounds, 749 F.2d 1103 (4th Cir. 1984); <u>Plumbers Specialty Supply Co. v. Enter. Prods. Co.</u>, 632 P.2d 752, 758 (N.M. Ct. App. 1981).

The summary judgment record establishes that KCS faced a substantial risk of liability for the alleged acts and omissions raised by the plaintiffs in the Davis suit. KCS has submitted the transcript of the August 22, 2005 bench trial as summary judgment evidence. <u>See</u> Record Document 87, Exhibit 200. Numerous lay witnesses testified that Pilgrim's railcars on the sidetracks and potholes on McDonald Drive going over the sidetracks had previously caused numerous "close calls" between automobiles and trains at the McDonald Drive crossing. Mr. Davis himself testified that cars on the sidetracks on the day of the accident and the potholes distracted him, slowed him down, impaired his visibility, and caused the collision. The plaintiffs' trial expert presented a scientific analysis of the accident and crossing, which he found problematic because it lacked signage indicating the presence of the sidetracks. The trial evidence also established that Mr. Davis was as severely injured as a person can be without dying. Mr. Davis, who was only in his 30s at the time of trial, presented over $600,000 in medical bills at trial, as well as evidence that he would need ongoing medical care for the rest of his life. Moreover, the trial judge warned KCS after his review of the pretrial submissions that he not only expected to find KCS liable to the Davises but would likely award significant damages to them. After the case settled, the judge informed the parties that he would have found KCS liable due to the crossing's "deplorable condition" and that the settlement amount was so close to his contemplated damage award that it was "scary." <u>See id.</u>, Exhibit 200. Given the evidence presented at trial and the trial judge's admonitions, the Court finds that KCS

settled the Davis suit under a reasonable apprehension of liability.

The summary judgment record also demonstrates that the settlement reached was reasonable.  Ascertaining whether an indemnitee "acted reasonably should not be considered with the benefit of 20/20 hindsight."  Musgrave, 2004 Mich. App. LEXIS 2443, at *8-9.  Instead, courts must focus "on the reasonableness of the action at the time it was taken."  Id.  Here, KCS settled the case for $2,258,884.40.  The settlement occurred after the presiding judge indicated that KCS would probably be found at fault and liable  for significant damages in a suit in which the plaintiffs were seeking $5.5 million.  See Record Document 87, Exhibits 223, 225.  Again, the Davis plaintiffs presented trial evidence regarding the severity of Mr. Davis' injuries, his current medical bills of $600,000, and the need for ongoing medical care for the rest of his life.  Further, the presiding trial judge in the Davis suit, counsel for the plaintiffs, and David Fraser, an expert in railroad crossing litigation, all have opined that, in light of the circumstances, the settlement was reasonable. See id., Exhibits 98, 200, 225, 234.  As a matter of law, this Court agrees.

Accordingly, KCS' Motion for Summary Judgment on its contractual indemnity claim is granted.  Pilgrim's is obligated to reimburse $2,258,884.40, the amount of the Davis settlement, to KCS.  This settlement amount clearly constitutes "loss" or "damages" within the meaning of the Agreements' indemnity provisions.  See id., Exhibits 31 at § 22 and 32 at § 9(c).  KCS also moved for summary judgment on Pilgrim's liability for the reasonable attorneys' fees and court costs associated with KCS's defense of the covered acts and omissions alleged in the Davis suit.[10]   Section 22 and Section 9(c) require Pilgrim's to

---

[10]KCS does not presently seek summary judgment on the amount of such legal expenses.

reimburse KCS for the reasonable attorneys' fees and court costs associated with its defense of the covered acts and omissions alleged in the Davis suit.  These provisions provide that Pilgrim's will "defend" the covered acts in an underlying action and indemnify KCS for "legal fees and court costs."  Id.  Louisiana courts have held such language to provide for the recovery of defense costs in the underlying suit for which indemnity is sought. See Richey v. Moore, 840 So. 2d 1265, 1268 (La. Ct. App. 2003); S. Cent. Bell Tel. Co. v. Gaines Petroleum Co., 499 So. 2d 521, 525 (La. Ct. App. 1986); Barton Protective Servs., Inc. v. Coverx Corp., 615 So. 2d. 438, 441-42 (La. Ct. App. 1993).  Based on these legal standards, KCS' motion for summary judgment is also granted as to Pilgrim's liability for the reasonable attorneys' fees and court costs associated with KCS's defense of the covered acts and omissions in the Davis suit.

Finally, KCS moved for summary judgment on Pilgrim's affirmative defenses.  See Record Document 87-2 at 18-25.  In opposing the motion, Pilgrim's specifically addressed the following affirmative defenses:  judicial estoppel, estoppel, waiver, unclean hands, and failure to mitigate damages.  See Record Document 94 at 18-25.  Thus, the Court will assume that Pilgrim's is pursuing only these five affirmative defenses.  For the reasons stated in Section II at page 11 of the instant Memorandum Ruling, KCS' motion is granted as to judicial estoppel.  KCS's motion is likewise granted as to Pilgrim's estoppel defense. Estoppel is not favored in Louisiana law and should be examined carefully and strictly. See Case v. La. Med. Mut. Ins. Co., 624 So.2d 1285, 1290 (La.App. 3 Cir. 1993).  Here, Pilgrim's only evidence remotely related to its estoppel defense is KCS's alleged silence regarding the existence of the indemnity agreements and the Davis suit.  Such evidence is insufficient to support the defense, as "[m]ere silence of itself will not raise an estoppel."

Int'l Ass'n of Machinists, Crescent City Lodge No. 37, AFL-CIO v. Higgins, Inc., 239 F.Supp. 252, 254 (E.D.La. 1965).

Pilgrim's bases its waiver defense on KCS's supposed bad faith in the underlying lawsuit.  See Record Document 94 at 24.  Under Louisiana law, bad faith envisions "an intentional and malicious failure to perform."  La. C.C. Art. 1997, comment (c).  There is nothing in the summary judgment record indicating malicious intent on the part of KCS; thus, the motion is granted as to the waiver defense.

"The doctrine of unclean hands allows a court to bar recovery when a party asserting an *equitable claim* against another can be shown to have engaged in fraud or bad faith behavior with that person."  Vaughn v. St. Helena Parish Pol. Jury, 261 F.Supp.2d 553, 566 (M.D.La. 2002), citing Alcatel U.S.A., Inc. v. DGI Technologies, Inc., 166 F.3d 772, 796 (5th Cir.1999); see also Garcel, Inc. v. Hibernia Nat. Bank, No. 01-772, 2002 WL 356307, *3 (E.D.La. March 5, 2002) ("It is well established in our jurisprudence that the defense of "unclean hands" is applicable only to actions for equitable relief.").  Here, KCS's contractual indemnification claim is one for legal relief.  The doctrine of unclean hands is inapplicable and KCS's motion on this ground is granted.

As argued by KCS, the Court finds that Pilgrim's defense of failure to mitigate is simply another attack on the reasonableness of the settlement entered in the Davis suit.  Therefore, for the reasons stated in Section III at pages 18-19 of the instant Memorandum Ruling, KCS' motion is granted as to Pilgrim's failure to mitigate defense.

## CONCLUSION

Based on the foregoing analysis, KCS's Motion for Summary Judgment is

**GRANTED** and Pilgrim's Motion for Summary Judgment is **DENIED**.  The Court enters judgment in favor of KCS in the amount of $2,258,884.40, the amount of the Davis settlement.  Moreover, judgment in favor of KCS is entered as to reasonable attorneys' fees and court costs associated with KCS's defense of the Davis suit.[11]

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 29th day of March, 2010.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

---

[11]Pilgrim's counterclaims of spoliation and abuse of process remain and will be the subject of a separate Memorandum Ruling.